UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WASHINGTON INTERNATIONAL INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>ARTEK BUILDERS, INC.,<br><br>    Defendant | CIVIL ACTION NO. 05-CV-10437-GAO |

**WASHINGTON INTERNATIONAL INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Washington International Insurance Company ("Plaintiff" or "WIIC") submits the following memorandum in support of its Motion for Summary Judgment.

**I.    INTRODUCTION**

This is an action for declaratory judgment brought by Washington International Insurance Company ("WIIC" or the "Surety") against Artek Builders, Inc. ("Artek"). Between June, 2003 and April, 2004, WIIC issued nine (9) labor and material payment bonds (the "Bond(s)"), on behalf of its Principal, J.S. Luiz, 3rd, Inc. ("Principal" or "Luiz"), in favor of various owners as Obligees, for public construction projects (the "Projects"), throughout the Commonwealth of Massachusetts. In furtherance of its contracts, Luiz utilized Artek to supply labor to the various construction sites. Artek has made claims against the nine (9) Bonds seeking payment from the Surety pursuant to M.G.L. c. 149, § 29, for labor performed on the various Projects.

Artek is not entitled to payment from the Surety against the Bonds, as the undisputed record demonstrates that Artek is the alter-ego and/or an insider or within the family of Luiz companies, and therefore, not a claimant as defined by M.G.L. c. 149, §29. As such, WIIC is

exonerated and discharged from any liability under the Bonds and Summary Judgment should enter in its favor.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

WIIC hereby incorporates by reference as if fully set forth herein, its Statement of Undisputed Material Facts filed in Support of its Motion for Summary Judgment.

## III.  ARGUMENT

### A.  Summary Judgment Standard.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). A fact is "material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). "An issue is genuine if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc., 167 F.3d 1, 7 (1st Cir. 1999).

The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the non-moving party's case." Michelson v. Digital Financial Services, 167 F.3d 715, 720 (1st Cir.1999) (citations omitted). Once the moving party has met its burden to, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." Id. (citations omitted). In determining whether summary judgement is proper, the Court "view[s] all the facts in the light most favorable to the nonmoving party and indulge[s] all inferences advantageous to that party, provided they arise reasonably from the record." Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991) (citation omitted). The party

2

opposing summary judgment may not rest on mere allegations or denials of his pleadings but must produce "definite, competent evidence" on which the non-movant bears the ultimate burden of proof. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (citations omitted). Summary judgment must enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. ", Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

> **B. American Is Entitled To Summary Judgment Because The Undisputed Record Demonstrates That Artek Is An Insider Of The Principal Or Within The Family Of Luiz Entities And Not A Claimant Recognized Under M.G.L. c. 149, § 29.**

In order to enter into a contract with a Massachusetts public awarding authority for a public construction project, the general contractor must furnish a labor and materials payment bond. Mass. Gen. L. c. 149, § 29. Mass. Gen. L. c. 149, § 29 was enacted to afford payment security protection to subcontractors and materialmen on public works construction projects. Manganaro Drywall, Inc. v. White Construction Co., Inc., 372 Mass. 661, 664, 363 N.E.2d 669 (1977). The fundamental purpose of M.G.L. c. 149, § 29 (the "Bond Statute"), "is to afford security to subcontractors and materialmen in public works because they do not have the benefit of a mechanic's or materialman's lien, as would be the case in private construction work." Floors, Inc. v. B.G. Danis of New England, Inc., 7 Mass. App. Ct. 356, 358, 387 N.E. 2d 1166 (1979). A payment bond issued pursuant to M.G.L. c. 149, s. 29, may hold a surety liable for labor and materials furnished by a subcontractor when the contractor under the bond defaults. See, Mass. Gen. L. c. 149, § 29.

The Massachusetts Bond Statute is closely analogous to its federal counterpart, the Miller Act, 40 U.S.C.A. §§ 270, et seq. *See,* Warren Bros. Co., Inc. v. Cardi Corp., 471 F.2d 1304,

3

1308 (1st Cir. 1973).  Like the Bond Statute, "the Miller Act was designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects." J.W. Bateson Co., Inc. v. U.S. ex rel. Bd of Trustees of Nat. Automatic Sprinkler Industry Pension Fund, 434 U.S. 586, 589, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978)(a lien cannot attach to Government property, therefore persons supplying labor or materials on a federal construction project were to be protected by a Miller Act payment bond).  Moreover, the purpose of the Miller Act is to protect those who furnish labor and material for public construction projects and to insure that they will receive payment.  St. Paul-Mercury Indemnity Co. v. U.S. ex rel. H.J. Jones, 238 F.2d 917, 921 (10th Cir. 1956); U.S. ex rel. Johnson Pugh Mechanical, Inc. v. Landmark Const. Corp., 318 F. Supp. 2d 1057, 1069 (D. Colo. 2004).  Further like the Bond Statute, a Miller Act payment bond will generally hold a surety liable for labor and materials furnished by a subcontractor when the contractor under the bond defaults.  American Casualty Co. v. Assiran, 289 F. Supp. 645, 647 (D. Mass. 1968).  Because of the substantive similarities between the two statutes, Federal courts deciding cases construing M.G.L. c. 149, § 29, may look to analogous federal decisions under the Miller Act.  Warren Bros. Co., 471 F.2d at 1307.

Under the Miller Act, a subcontractor is defined as one who performs for and takes from the prime contractor a specific part of the labor or materials requirements of the original contract. Johnson Pugh, 318 F. Supp. 2d at 1069.  The Miller Act was not designed to protect prime or general contractors, or "the principals" for whom the payment bond was issued..  St. Paul-Mercury Indemnity Co., 238 F.2d at 921; *see also*, U.S. ex rel. J.W. Briggs v. Grubb, 358 F.2d 508 (9th Cir. 1966).  Nor was the Miller Act designed to "protect suppliers of labor and materials who are "insiders" or within the "family" of the principal's entities. Johnson Pugh, 318 F. Supp. 2d at 1069 *citing* American Casualty Co. v. Assiran, 289 F. Supp. 645, 646 (D. Mass. 1968).

Rather, "the purpose of a Miller Act bond is to protect those suppliers of labor and materials who are <u>*not* part of 'the family' of the principal</u> and who are, as it were, strangers dealing without opportunity for knowledge of the principal's resources and without a common commitment in joint ventures." <u>Assiran</u>, 289 F. Supp. 645, 646 (D. Mass 1968) (emphasis added).

Consequently, a Miller Act payment bond does not make a surety liable for monies expended on the contract by a partner of the contractor under the bond, or a joint venturer in the general contract itself, or a portion of it. *See*, <u>U.S. *ex rel.* J.W. Briggs v. Grubb</u>, 358 F.2d 508, 512 (9th Cir. 1966); <u>St. Paul-Mercury Indemnity Co.</u>, 238 F.2d at 921. This long standing principle has been established by cases interpreting the coverage of the Miller Act and its statutory predecessor, the Heard Act, and has been applied in varying factual circumstances. <u>Id.</u> [Citing <u>Hardaway v. National Surety Co.</u>, 211 U.S. 552, 559, 29 S. Ct. 202, 53 L. Ed 321 (1909) (principle applied to co-adventure with the principal), <u>Continental Casualty Co. v. United States</u>, 308 F. 2d 846 (5th Cir. 1962) (principle applied to subsidiary of principal), and <u>National Surety Corp. v. United States</u>, 378 F.2d 294, 295-296 (5th Cir. 1967) (principle applied to corporation controlled by the same individual who controlled the principal named in the bond)]. To ascertain whether a subcontractor's recovery against a bond is proper, the true relationship between the subcontractor and the principal must be determined by the conduct of the parties, together with all the other material facts and circumstances. <u>St. Paul-Mercury Indemnity Co.</u>, 238 F.2d at 921. To this end, <u>U.S. ex rel. Johnson Pugh Mechanical, Inc. v. Landmark Const. Corp.</u>, 318 F. Supp. 2d 1057 (D. Colo. 2004), is instructive.

In <u>Johnson Pugh,</u> a mechanical subcontractor sued a surety under a Miller Act payment bond for money owed under a subcontract with the insolvent principal. 318 F. Supp. 2d 1057, 1059. The surety denied the claim alleging that the claimant was an "insider" and an "alter ego"

5

of the principal. Id. At the outset, the Court recognized that a principal cannot recover on a payment bond, and that the Miller Act does not protect "insiders" or others within the "family" of the principal's entities who happen to supply labor and materials under a subcontract. Id. at 1069. As such, the Court conducted an extensive factual analysis of the "alter ego doctrine," considering the following 10 factors to conclude whether recognition of a separate corporate entity would result in injustice in the case:

1. The parent corporation owns all or majority of the capital stock of the subsidiary;
2. The parent and subsidiary corporations have common directors or officers;
3. The parent corporation finances the subsidiary;
4. The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;
5. The subsidiary has grossly inadequate capital;
6. The parent corporation pays the salaries or expenses or losses of the subsidiary;
7. The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;
8. In the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division;
9. The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation;
10. The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

Id. at 1072; 1074-1075. Although all 10 factors were not present, nor did they have to be, the Court sided with the surety and denied the subcontractor's bond claim finding that the claimant subcontractor was the alter ego and insider of the principal and formed a part of the same corporate family for purposes of determining liability under the payment bond. Id. at 1075. Because the subcontractor's claims were "insider" claims, asserted by an entity closely affiliated

6

with the principal, recovery under the bond was denied so as not to frustrate the purposes behind the Miller Act. Id.

Here, like Johnson Pugh, the application of the undisputed record to the 10 factors set forth in the "alter ego doctrine" supports the finding that Artek is the alter ego and insider of Luiz, and not a claimant as intended by the Massachusetts Bond Statute.

**1.   The parent corporation owns all or majority of the capital stock of the subsidiary.**

The record demonstrates that like Johnson Pugh, for at least some period of time, Joseph S. Luiz, President of Luiz, owned all of the capital stock of Artek. (Facts at ¶5, 7). Thereafter, Mr. Luiz transferred all of his shares to an employee of Luiz, Shirley Cormier, who later became his wife. (Facts at ¶8, 11).

**2.   The parent and subsidiary corporations have common directors or officers.**

There is no dispute that Joseph S. Luiz served as President of Luiz at the same time he served as President, Treasurer, Clerk, sole director and shareholder of Artek. (Facts at ¶5, 7).

**3.   The parent corporation finances the subsidiary.**

The record demonstrates that from the time Artek was incorporated in April of 2000, Artek only provided labor to construction projects managed by Luiz and served as Luiz' "in-house" subcontractor. (Facts at ¶14, 15). Artek was incorporated for the primary purpose of providing labor for construction projects generated by Luiz and as such, the custom and practice between the two entities was that Artek billed Luiz for pure labor costs, only. (Facts at ¶6, 17, 19). Luiz was Artek's sole source of income and throughout its incorporation, Luiz paid for all of the costs associated with operating the business, including the weekly salary of its President, Diane Merlo. (Facts at ¶16, 17, 24, 25). Because of the custom and practice between the two

companies, Artek never had the assets to finance itself, pay any of its expenses or losses on its own, or establish the capital necessary to independently sustain itself apart from Luiz. (Facts at ¶20). Based on the foregoing, there is no dispute that from its incorporation, throughout all materials times hereto, Luiz financed Artek.

    **4.    The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.**

There is no dispute that Joseph S. Luiz caused the incorporation of Artek and did so for the primary purpose of providing a source of labor for construction projects generated by Luiz. (Facts at ¶6).

    **5.    The subsidiary has grossly inadequate capital.**

Luiz was Artek's sole source of income. (Facts at ¶16). From the time Artek was incorporated and at all times material hereto, Luiz paid for all of Artek's labor and material costs for all of the projects Artek worked on with Luiz. (Facts at ¶17). Throughout the history of the relationship between Luiz and Artek, Luiz never contemplated, agreed to pay, or paid overhead and profit to Artek for labor provided by Artek on Luiz projects. (Facts at ¶18). Rather, the custom and practice between the two companies was that Artek billed Luiz for pure labor costs, only. (Facts at ¶19). Because of the custom and practice between the two companies, Artek never had the assets to finance itself, pay any of its expenses or losses on its own, or establish the capital necessary to independently sustain itself apart from Luiz. (Facts at ¶20). It is therefore undisputed that Artek was undercapitalized and would encounter serious financial trouble without Luiz.

    **6.    The parent corporation pays the salaries or expenses or losses of the subsidiary.**

There is no dispute that from the time Artek was incorporated, Luiz paid for all of Artek's labor and material costs for all projects Artek worked on with Luiz, including the Projects at issue, as well as, the weekly salary of Artek's President, Diane Merlo. (Facts at ¶ 17, 24). In addition, the invoices demonstrate that Artek billed Luiz for <u>all</u> operating costs incurred by Artek, including, but not limited to, workers compensation insurance, general liability insurance, taxes, telephone services, office supplies, employee expenses, materials, pension plan expenses, and accounting services. (Facts at ¶ 25). It is further undisputed that following Artek's lay-off on September 16, 2004, Luiz placed all of Artek's employees on its payroll to continue the Projects then in progression. (Facts at ¶ 32).

**7. The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.**

There is no dispute that from the time Artek was incorporated, Luiz was Artek's sole source of income and business. (Facts at ¶ 16, 27). Likewise, Artek's only assets were those conveyed to it by Luiz to cover the costs of the labor and material it supplied to Luiz Projects. (Facts at ¶ 17-20).

**8. In the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division.**

The record evidences that Artek's President considered Artek the "in-house" subcontractor of Luiz, and that Luiz required Artek to pay an annual "management services fee." (Facts at ¶ 9, 15).

**9. The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation.**

9

Here, the record demonstrates that from the time of its incorporation, Luiz required Artek to pay a management services fee. (Facts at ¶ 9). Moreover, from the time of its incorporation, Artek was managed not only by Luiz, but, by a Luiz employee, i.e. first, Joseph Luis, then, Shirley Cormier and then, Artek's President, Diane Merlo. (Facts at ¶ 7, 8, 11).Diane Merlo was in essence an employee of Luiz, as Luiz paid Ms. Merlo's weekly salary from the time she was appointed President, Treasurer, Clerk and sole director of Artek in September 2003, up to the time Artek provided notice to surety of its claims against the Bonds. (Facts at ¶ 12, 24). As such, Artek at all times took direction from Luiz.

### 10. The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

As Artek was at all times managed by Luiz or a Luiz employee (including Diane Merlo), and as Artek relied entirely on Luiz for income, and payment of all operating expenses and losses, the formal legal requirements that Artek operate as a separate and independent corporation were not observed. (Facts at ¶ 7-12; 14-20; 24-25; 27).

Like <u>Johnson Pugh</u>, the undisputed record in this case sufficiently demonstrates that all 10 factors of the alter ego doctrine are met. As such, for purposes of determining whether the WIIC is liable under the payment bond, there is no dispute that Artek is the alter ego and insider of Luiz and formed a part of the same corporate family. Because Artek's claims are insider claims, asserted by an entity not only closely affiliated with Luiz, but managed and financed entirely by the principal, Artek's is not entitled to recovery under the bond as a matter of law. As a result, the surety's obligations under the bond are exonerated and discharged and summary judgment should enter in WIIC's favor.

## IV. CONCLUSION

Based on the foregoing arguments, the Summary Judgment Motion of the Plaintiff, Washington Internation Insurance Company must be allowed.

>Respectfully Submitted,
>**Washington International Insurance Company,**
>By its attorneys,
>
>
>/s/ Paula-Lee Chambers
>Paula-Lee Chambers, BBO# 566888
>Hinshaw & Culbertson LLP
>One International Place, 3rd Floor
>Boston, MA 02110
>(617) 213-7000

Date: January 30, 2006

34017043v1 856540